**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRACEY ELLIS, III Derivatively on Behalf of LIFEMD, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN SCHREIBER, MARC BENATHEN, JOSEPH V. DITROLIO, WILLIAM FEBBO, JOAN LAROVERE, CALUM MACRAE, ROBERTO SIMON, and JOHN STRAWN,<br><br>Defendants,<br><br>-and-<br><br>LIFEMD, INC.,<br><br>Nominal Defendant. | Civil Action No.:<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Tracey Ellis, III ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant LifeMD, Inc. ("LifeMD" or the "Company") against the Individual Defendants (defined below) seeking to remedy their breaches of fiduciary duties and other violations of law from April 28, 2025 through August 5, 2025 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by LifeMD with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by LifeMD; (c) review of news articles, stockholder communications, and postings on LifeMD's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a securities fraud class action pending in this Court captioned *Johnston v. LifeMD, Inc. et al.*, Case No. 1:25-cv-09153 (the "Securities Class Action"); and (e) review of other publicly available information concerning LifeMD and the Individual Defendants.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a shareholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain officers and members of the Company's Board of Directors (the "Board").

2. LifeMD operates as a direct-to-patient telehealth company that connects consumers to healthcare professionals for medical care in the United States. LifeMD offers a weight management program that provides access to GLP-1 medications through its telehealth platform,

RexMD, that also provides access to virtual medical treatment for a variety of men's health needs, including erectile dysfunction, premature ejaculation, and hair loss.

3. Throughout the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding LifeMD's position in the GLP-1 market, and issue guidance for 2025 that failed to take into account rising customer acquisition costs in LifeMD's RexMD segment, as well as its weight management business.

4. Then, on August 5, 2025, after the market closed, the Company issued a press release entitled "LifeMD Reports Second Quarter 2025 Results." This press release stated that due to "some temporary challenges facing our Rex MD business," which were "largely resolved," the Company was "revising [its] full year 2025 guidance for revenue and adjusted EBITDA to reflect the full-year impact of these issues, while still anticipating strong year-over-year growth in both metrics."

5. On the earnings call held that same day, the Company revealed that the lowering of its 2025 guidance was due to its weight management segment "being impacted by a higher-than-anticipated refund rate" and to "elevated customer acquisition costs" related to its RexMD business.

6. On this news, the price of the Company's stock fell $5.31 per share, or approximately 44.8%, from a close of $11.84 per share on August 5, 2024, to close at $6.53 per share on August 6, 2024.

7. While the Company was issuing the false and misleading statements, certain of the Individual Defendants, as alleged herein, were using their knowledge of adverse material nonpublic information to sell their holdings of Company stock at inflated prices at the expense of LifeMD and its shareholders.

8. The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

9. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, LifeMD has sustained damages as described below.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13. The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

16. Plaintiff is a stockholder of LifeMD, was a stockholder of LifeMD at the time of the wrongdoing alleged herein and has been a stockholder of LifeMD continuously since that time. Plaintiff is a citizen of the State of Illinois.

17. Defendant LifeMD is incorporated under the laws of Delaware with its principal executive offices located at 256 Fifth Avenue, Suite 400 New York, New York 10001.

18. Defendant Justin Schreiber ("Schreiber") has served as Chief Executive Officer ("CEO") and Chairman of the board of directors since 2018. Schreiber is named as a defendant in the Securities Class Action. As demonstrated by the chart below, Defendant Schreiber sold shares of LifeMD at great profit while in possession of non-public information:

| **Transaction Date** | **Shares** | **Price Per Share** | **Proceeds** |
|---|---|---|---|
| 2025-06-02 | 25,000 | $12.4462 | $311,655.00 |
| 2025-07-01 | 25,000 | $13.3783 | $334,457.50 |
| 2025-07-01 | 25,000 | $9.9876 | $249,690.00 |
| **TOTALS** | **75,000** | | **$895,802.50** |

19. Upon information and belief, Schreiber is a citizen of Puerto Rico.

20. Defendant Marc Benathen ("Benathen") has served as LifeMD's Chief Financial Officer since 2021. Benathen is named as a defendant in the Securities Class Action. As demonstrated by the chart below, Defendant Benathen sold shares of LifeMD at great profit while in possession of non-public information:

| **Transaction Date** | **Shares** | **Price Per Share** | **Proceeds** |
|---|---|---|---|
| 2025-06-16 | 75,000 | $13.0926 | $981,945.00 |
| 2025-06-17 | 50,000 | $14.0099 | $700,495.00 |
| **TOTALS** | **125,000** | | **$1,682,440.00** |

21. Upon information and belief, Benathen is a citizen of the State of New York.

22. Defendant Joseph V. DiTrolio ("DiTrolio") was appointed to the Board in 2014. DiTrolio serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Upon information and belief, DiTrolio is a citizen of the State of New Jersey.

23. Defendant William Febbo ("Febbo") was appointed to the Board in June 2023. Upon information and belief, Febbo is a citizen of Puerto Rico.

24. Defendant Joan LaRovere ("LaRovere") was appointed to the Board in 2023 and serves as a member of the Audit Committee. Upon information and belief, LaRovere is a citizen of the Commonwealth of Massachusetts.

25. Defendant Calum MacRae ("MacRae") was appointed to the Board in April 2024. Upon information and belief, MacRae is a citizen of the Commonwealth of Massachusetts.

26. Defendant Roberto Simon ("Simon") was appointed to the Board in 2020. Simon serves as Chair of the Audit Committee and a member of the Compensation Committee. Upon information and belief, Simon is a citizen of the Commonwealth of Massachusetts.

27. Defendant John Strawn ("Strawn") was appointed to the Board in 2011. Strawn serves as a member of the Audit Committee and Chair of the Compensation Committee and the Nominating and Corporate Governance Committee. Upon information and belief, Strawn is a citizen of the State of Texas.

28. Collectively, Defendants Schreiber, Benathen, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn are referred to herein as the "Individual Defendants."

29. Collectively, Defendants Schreiber and Benathen are referred to herein as the "Insider Selling Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

30. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe LifeMD and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage LifeMD in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LifeMD and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

31. Each Individual Defendant owed and continues to owe LifeMD, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

32. The Individual Defendants, because of their positions of control and authority as directors and/or officers of LifeMD, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with LifeMD, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, finances, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

33. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c) remain informed as to how LifeMD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

34. Additionally, the Company's Code of Business Conduct and Ethics (the "Code"), applies to all directors, officers, and employees of LifeMD. Specifically, the Code states:

> It is the policy of LifeMD ("Conversion Labs" or the "Company") that the Company's Board of Directors ("Board"), Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), principal accounting officer or controller (or persons performing similar functions) and all employees adhere to, advocate and promote the following principles:
>
> • Loyalty to the interests of our shareholders, customers, suppliers, fellow employees, strategic partners and other business associates;
>
> • Honest and ethical conduct in any action, practice or course of conduct within the Company or with its business partners;

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission (the "SEC" or "Commission") and other public communications made by the Company; and • Compliance with laws, rules and regulations applicable to the Company.

**Conflicts of Interest**

• Insiders (directors, officers and employees of the Company) shall maintain a high degree of integrity in the conduct of the Company's business and maintain independent judgment. Each insider must avoid any activity or personal interest that creates, or reasonably appears to create, a conflict between his/her interests and the interests of the Company.

* * *

**Corporate Opportunities and Transactions with Business Associates**

Insiders and their family members must not profit, directly or indirectly, due to their position in the Company to the detriment, or at the expense, of the Company or any of its business associates. No insider shall take for his or her own advantage any business opportunity for profit, which he or she learns about as a result of his or her position with the Company.

35. In addition to these duties, the Board's Audit Committee members during the Relevant Period, Defendants Simon, Strawn, and LaRovere (referred to herein as the "Audit Committee Defendants") had enhanced duties and responsibilities. Per the Audit Committee Charter:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of LifeMD, Inc. ("LFMD" or the "Company") is to oversee the processes of accounting and financial reporting of the Company and the audits and financial statements of the Company. The Committee's primary duties and responsibilities are to:

A. Monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance.

B. Monitor the independence and performance of the Company's independent auditors and the Company's accounting personnel.

> C. Provide an avenue of communication among the independent auditors, management, the Company's accounting personnel, and the Board.
>
> D. Appoint and provide oversight for the independent auditors engaged to perform the audit of the financial statements.
>
> E. Discuss the scope of the independent auditors' examination.
>
> F. Review the financial statements and the independent auditors' report.
>
> G. Review areas of potential significant financial risk to the Company.
>
> H. Monitor compliance with legal and regulatory requirements.
>
> I. Solicit recommendations from the independent auditors regarding internal controls and other matters.
>
> J. Make recommendations to the Board.
>
> K. Resolve any disagreements between management and the auditors regarding financial reporting.
>
> L. Prepare the report required by Item 407(d) of Regulation S-K, as required by the rules of the Securities and Exchange Commission (the "SEC").
>
> M. Perform other related tasks as requested by the Board.

36. Per the Audit Committee Charter, the Audit Committee Defendants also had the following responsibilities:

> **Review Procedures**
>
> A. Review the Company's annual audited financial statements prior to distribution. Review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices, and judgments.
>
> B. In consultation with the management, the independent auditors, and the Company's principal accounting officer, consider the integrity of the Company's financial reporting processes and controls, including any major issues as to the adequacy of the Company's internal controls, and any special steps adopted in light of any identified material control deficiencies. Discuss significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures. Review significant findings prepared by the independent auditors and the Company's principal accounting officer together with management's responses.

C. The Committee shall review with the management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies.

* * *

**Accounting Department and Legal Compliance**

The Committee shall:

A. Review the personnel activities and qualifications of the Company's accounting personnel, as needed.

B. Review the appointment and performance of the principal accounting officer, and review financial and accounting personnel succession planning with the Company.

C. Review significant reports prepared by the Company's principal accounting officer together with management's response and follow-up to these reports.

D. On at least an annual basis, review with the Company's counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and inquiries received from regulators or governmental agencies.

E. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

F. The Committee shall review the CEO and CFO's disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

G. Conduct an appropriate review of and approve all related party transactions on an ongoing basis and the Committee shall review potential conflict of interest situations where appropriate. H. Conduct an annual risk review with respect to the matters within the role and the responsibilities of the Committee.

The Committee shall:

(a) Report regularly to the Board on its activities;

(b) Maintain minutes of its meetings and records relating to those meetings and the Committee's activities;

(c) Have authority to obtain, at the expense of the Company, advice and assistance from internal or external legal, consulting or other advisors;

(d) Form and delegate authority to subcommittees of one or more Committee members when desired and appropriate;

(e) Review and reassess the adequacy of this Charter annually and recommend to the Board any proposed changes to this Charter; and

(f) Periodically review the Committee's own performance.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

37. LifeMD started in 1994 as ImmuDyne and went public in 2001. In 2018, the Company became Conversion Labs and then finally rebranded as LifeMD in 2020 and launched their flagship virtual primary care offering that offers patients 24/7 access to physicians for primary, urgent, and other care needs.

38. LifeMD operates a men's telehealth platform, RexMD, that provides consumers with access to specialty products for a variety of health needs. The service complements the LifeMD telehealth service and has served approximately 500,000 customers since inception.

39. LifeMD's main revenue driver is their virtual primary care platform. This platform works together with RexMD and its weight management programs to start patients with a virtual appointment with a clinician, who can then prescribe GLP-1 medications like Wegovy or Ozempic. These medications help lower blood sugar to support weight loss and are approved by the Food and Drug Administration ("FDA"). GLP-1s are meant for patients with a body mass index (BMI) of 30 or higher (obesity), or for those with a BMI of 27 or higher if they have at least one weight-related health condition like high blood pressure, high cholesterol, or type 2 diabetes.

40. Throughout the Relevant Period, the Individual Defendants caused LifeMD to issue false and misleading statements that inflated guidance for 2025 and failed to disclose rising customer acquisition costs for its RexMD segment as well as its weight management program.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND/OR MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

41. On April 28, 2025, Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn caused the Company to file an annual proxy statement with the SEC (the "2025 Proxy"). In the 2025 Proxy, the Board sought shareholder approval for, *inter alia*, (1) the re-election of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn as directors; and (2) the ratification of the appointment of CBIZ CPAs, P.C. ("CBIZ") as the Company's Independent Registered Public Accounting Firm for 2025.

42. Regarding the Board's role in risk oversight the 2025 Proxy stated:

> Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management policies and strategy, and the most significant risks facing us, including cybersecurity, and oversees the implementation of risk mitigation strategies by management. Our Compensation Committee is responsible for overseeing risks related to our compensation programs. Our Nominating and Corporate Governance Committee is responsible for overseeing risks related to our corporate governance policies and practices. Our Board is also apprised of particular risk management matters in connection with its general oversight role, including approval of corporate matters and significant transactions.

43. The 2025 Proxy stated the following regarding the Company's Audit Committee:

> ***Audit Committee***
>
> The Audit Committee oversees our accounting and financial reporting processes and oversee the audit of our consolidated financial statements and the effectiveness of our internal control over financial reporting. The specific functions of this Committee include, but are not limited to:

- the appointment of an independent registered public accounting firm and overseeing the engagement of such firm;
- approving the fees to be paid to the independent registered public accounting firm;
- helping to ensure the independence of the independent registered public accounting firm;
- overseeing the integrity of our financial statements;
- preparing an audit committee report as required by the SEC to be included in our annual proxy statement;
- resolving any disagreements between management and the auditors regarding financial reporting;
- reviewing with management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies;
- reviewing and approving all related-party transactions; and
- overseeing compliance with legal and regulatory requirements.

44. The above statements conveyed that the Board and its committees maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in LifeMD's compliance and financial reporting; yet was unaware of existing material risks that could and would affect the Company.

45. The 2025 Proxy failed to disclose that: (1) LifeMD's competitive position was overstated; (2) LifeMD's 2025 guidance failed to properly account for rising customer acquisition costs in its RexMD segment as well as its weight management business; and (3) as a result, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

46. Due to the false and misleading 2025 Proxy, shareholders voted to approve each of the proposals in the 2025 Proxy.

47. The 2025 Proxy harmed LifeMD by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting LifeMD. As a result of the false or misleading statements and omissions of adverse facts in the 2025 Proxy, LifeMD stockholders voted to (1) reelect Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn to the Board; and (2) ratify CBIZ as the Company's independent registered public accounting firm for the year ending December 31, 2025.

48. On May 6, 2025, after the market opened, LifeMD issued a press release entitled "LifeMD Reports First Quarter 2025 Results and Raises Full-Year 2025 Guidance" (the "Q1 2025 Release"). The Q1 2025 Release stated the following:

> LifeMD had an outstanding first quarter that demonstrated the power of our platform, the need for our services and the accelerated growth trajectory of the business as we achieved our first-ever quarter of GAAP profitability well ahead of expectations. ***During the quarter we expanded across all service areas, and the performance of our weight management program underscored our success as it is now expected to exceed top and bottom-line expectations for the full year.***[1] The launch of our men's hormone therapy offering, and recent acceptance of Medicare are also off to strong starts and continue to diversify our already leading telehealth platform.
>
> * * *
>
> ***Our recently announced strategic collaborations with both LillyDirect and NovoCare continue to generate momentum by allowing us to offer more convenient and affordable access to branded GLP-1 medications. These collaborations make LifeMD the only telehealth provider in the U.S. that offers synchronous care and cash-pay access to both Wegovy® and Zepbound®.*** In addition to the continued success of our existing telehealth platforms, we recently announced key hires in the mental and hormonal health verticals and the acquisition of important assets in behavioral health and women's health. These are two strategic areas with significant unmet clinical need in the marketplace and within our existing patient population.

49. The Q1 2025 Release additionally stated the following:

> LifeMD had an exceptionally strong first quarter with top- and bottom-line growth

[1] Unless indicated otherwise, all emphasis is added.

> both ahead of our expectations. Telehealth revenue achieved 70% year-over-year growth on a standalone basis, while our telehealth adjusted EBITDA increased to $5.3 million from a loss of $1.3 million in the year-ago period. We also achieved positive GAAP net income for the first time[.] ***We are raising our full-year 2025 guidance to reflect our strong performance to date for both revenue and adjusted EBITDA. We now expect total revenues in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million.***

50. Further, the Q1 2025 Release stated that "[f]or the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its guidance" and then provided the following figures:

- Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million.
- Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million.
- Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.
- Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously.

51. That same day, the Company held its Q1 2025 Earnings Call (the "Q1 2025 Call") wherein the Company stated again that LifeMD was raising its guidance for 2025 "due to the outperformance of our Telehealth business to-date."

52. On the 1Q 2025 Earnings Call, Defendant Schreiber continued to boast of the growth of the RexMD segment, stating in relevant part:

> Now I'll turn to our virtual primary care platform. As recently announced, we've established strategic collaborations with LillyDirect and NovoCare to improve access to GLP-1 medications for weight management patients without insurance coverage. These partnerships reflect the growing recognition of our patient-first model and underscore our ability to streamline access to transformative therapies.
>
> LifeMD is now the only virtual care provider offering synchronous consults integrated with both NovoCare and LillyDirect, enabling seamless access to Wegovy and Zepbound. ***Combined with our direct-to-patient pharmacy,***

> ***specialized nationwide provider network and pharmacy benefits infrastructure, we believe we've created a category-defining competitive moat in virtual obesity care.*** It's worth noting that we expect to do exactly the same thing in many other verticals in the years to come.

53. Defendant Schreiber further stated the following on the Q1 2025 Call regarding the RexMD segment:

> ***Our RexMD brand continues to perform exceptionally well, with consistent growth in both revenue and active patient count, further reinforcing its position as a category leader in men's health.***
>
> As we previously guided, we continue to expand Rex beyond its original focus on sexual health into larger, high-demand verticals, including weight management, behavioral health, insomnia and hormone replacement therapy.
>
> Our newly launched HRT program is off to a strong start with early adoption, exceeding expectations and offering valuable insights into this fast-growing category. Notably, more than 40% of new HRT patients are existing RexMD patients already engaged in another care subscription.
>
> ***Later this year, we plan to introduce LifeMDPlus and other synchronous care offerings to RexMD's 180,000 active patients, unlocking a significant cross-care opportunity across our ecosystem.***

54. Defendant Schreiber also described the Company's "strong start to 2025" in the Q1 2025 Call stating:

> As we conclude our prepared remarks, I want to underscore how energized we are by ***LifeMD's strong start to 2025***. Our first quarter performance reflects disciplined execution against our strategic priorities and the early traction we're seeing across key initiatives gives us strong confidence in our trajectory for the remainder of the year.
>
> The programs we've launched, including the expansion of our benefits infrastructure, strategic collaborations with GLP-1 manufacturers, new RexMD offerings, and our entry into the women's and behavioral health space are all aligned with our near-term vision to build a trusted, vertically integrated marketplace for healthcare services, prescription medications and over-the-counter healthcare products.

55. The Q1 2025 Call also included an exchange between Defendant Benathen and an analyst regarding any potential "headwinds" that the Company was facing:

> Analyst: Hi. Congrats on the great quarter and thank you for taking the questions. So first just looking at your guidance for Telehealth, like raising the lower end for revenues following a strong quarter. This looks like you're spending Telehealth to be roughly flat sequentially. ***Is this just being conservative or there's some headwinds that you're anticipating that will limit your ability to grow sequentially***.
>
> Defendant Benathen: Yeah. No. It's not that there's headwinds. I mean there's some timing in the revenue that we have. I mean**, *we tend to take a relatively conservative view to revenue.*** We do normally expect and see that aspects of the Rex business and sexual health tend to be a little bit softer seasonally in Q2 than they are in Q1, which is what historically we've seen, particularly from new acquisition standpoints. We've baked that into our model also. But all that's pretty consistent with what we've seen in the past. Obviously, there's tremendous growth year-on-year and that's essentially how we're managing the business versus just managing for sequential growth every single quarter.

56. The statements referenced above in paragraphs 41-55 were materially false and/or misleading and failed to disclose that: (1) LifeMD's competitive position was overstated; (2) LifeMD's 2025 guidance failed to properly account for rising customer acquisition costs in its in its RexMD segment as well as its weight management business; and (3) as a result, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>THE TRUTH BEGINS TO EMERGE</u>**

57. On August 5, 2025, after the market closed, the Company issued a press release entitled "LifeMD Reports Second Quarter 2025 Results ("2Q 2025 Release"). In the 2Q 2025 Release the Company stated that due to "some temporary challenges facing our Rex MD business," the Company was "revising our full year 2025 guidance for revenue and adjusted EBITDA to reflect the full-year impact of these issues, while still anticipating strong year-over-year growth in both metrics."

58. Accordingly, the 2Q 2025 Release gave the following revised fiscal guidance:

- Total revenue in the range of $250 million to $255 million, compared with the previous guidance of $268 million to $275 million.

- Telehealth revenue in the range of $195 million to $200 million, compared with $208 million to $213 million previously.

- Adjusted EBITDA in the range of $27 million to $29 million, compared with $31 million to $33 million previously.

- Telehealth adjusted EBITDA is now forecast to be in the range of $14 million to $16 million, down from $21 million previously.

59. That same day, the Company held its Q2 2025 Earnings Call (the "Q2 2025 Call"). Defendant Schreiber stated the following during the Q2 2025 Call:

> Our weight management business remains robust, consistently attracting over 400 new patient sign-ups per day. Notably, we've seen a significant increase in patients accessing branded therapy options through our platform. Given current trends and the improvements we expect to see in pricing and insurance coverage, we expect that by year-end, the vast majority of new patients will be on an insurance covered GLP-1 therapy, an affordable cash-based therapy or one of our oral prescription therapies for weight loss.
>
> ***We continue to invest in improving the care platform that supports our weight management program.*** This decision is validated by the fact that we are seeing a growing number of weight management patients using our platform to access non-weight-related health care services and products. ***While our weight management segment did outperform our second quarter guidance plan for this segment, weight management has been impacted by a higher-than-anticipated refund rate driven by patients either lacking insurance coverage for their medications or being unable to afford the out-of-pocket cost of branded therapies***.
>
> Although this is a near-term headwind, we are actively enhancing our new patient intake process to include real-time benefit verification and other key improvements. These updates are designed to significantly improve the patient experience and drive higher conversion rates on to therapy. As part of these efforts, we are expanding access to a broader range of oral generic weight loss medications and adding liraglutide as a covered option. We remain highly confident in the long-term opportunity within prescription weight management. This is a large and underserved market, and we believe the steps we're taking will further strengthen our leadership position despite the temporary challenges.

60. Defendant Schreiber further stated the following during the Q2 2025 Call:

> ***Turning to Rex. We experienced a challenging second quarter, primarily due to temporarily elevated customer acquisition costs in the highly competitive ED market***. However, we have since adjusted our marketing and product

strategies and early third quarter data suggests a return to healthier customer acquisition levels. We remain confident in RexMD's long-term growth trajectory, especially as we continue to broaden our offerings into hormone replacement therapy, personalized compounded treatments for ED and hair loss as well as additional men's health categories.

61. When asked about acquisition costs, Defendant Schreiber stated:

[. . .] I'll just add, like remember, we [had an enormous transition], right, this past quarter with the weight management business, which just really required a lot of energy from almost everybody in the organization. And some of the -- we did see -- we obviously saw these changes [in the competitive environment], but some of it was just think we took our eye off the ball for a little bit, and it's -- we should have gotten this thing back online a little quicker, and we didn't. But again, as we try to -- as we communicated in the -- on the call earlier, like we feel really good about where the business is. There's a lot of exciting kind of new product opportunities for RexMD and we really want to communicate that this isn't something that we're going to -- we think we -- people should be concerned about going forward.

62. On the Q2 2025 Call, Defendant Benathen stated the following:

As Justin noted, our long-term financial outlook remains strong. Weight management, though experiencing some impact from higher refund rates from patients without coverage or for whom discounted cash pay pricing is still inaccessible, performed ahead of guidance plan in the second quarter.

New subscribers for weight management continued at strong levels and regularly exceeded 400 new patient sign-ups per day. WorkSimpli maintained its strong bottom line performance with quarterly adjusted EBITDA of nearly $3.7 million on a stand-alone basis. ***Our quarterly results were mostly impacted by temporary performance*** challenges impacting our RexMD business, which are largely behind us.

63. Defendant Schreiber additionally stated during the 2Q 2025 Call that "we weren't satisfied with our overall performance."

64. The 2Q 2025 Call also included Defendant Benathen being asked about the Company's full-year guidance, specifically the Company previously raising its 2025 guidance:

Analyst: Just kind of as a follow-up to the last question. I just want to make sure I fully understand it. So the full year guide down, ***that's totally related to the dynamics faced with the RexMD business despite the fact that you guys now have that resolved***. Just want to get an understanding of any impact that we

> would see from that in Q3 and then more recently in Q4.
>
> Benathen: ***Yes***. So the majority of it is related to that. There's a small proportion, as you mentioned, in the short term, there's some higher refund rates on the weight management patients. We're talking a few percentage points higher. That was a small proportion of the changes, which we've built into the Q2 and Q3 -- sorry, the Q3 guide.
>
> But the vast majority of it was the impact from performance in Rex in Q2 and then the downstream impact associated with less new subscribers that came in the door in Q2, retaining those people throughout the year and slightly softer sales performance than we had historically seen. Obviously, we're building back.
>
> But I'd say right now in terms of sales per day, we're at about 85% to 90% of where we've been historically, which is a big improvement over where we had been in the middle of Q2. But all of that is baked into the guidance. Now we've not assumed any potential complete rebound in Rex within that guidance. So we think we've taken a prudent point of view on that.

65. On this news, the price of LifeMD common stock fell $5.31 per share, or 44.8%, to close at $6.53 on August 6, 2025.

## DAMAGES TO LIFEMD

66. As a result of the Individual Defendants' improprieties, LifeMD disseminated improper public statements concerning LifeMD's business condition, prospects and internal controls. This misconduct has devastated LifeMD's credibility.

67. As a direct and proximate result of the Individual Defendants' actions, LifeMD has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

68. Moreover, these actions have irreparably damaged LifeMD's corporate image and goodwill. For at least the foreseeable future, LifeMD will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that LifeMD's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

71. Plaintiff is an owner of LifeMD common stock and was an owner of LifeMD common stock at all times relevant hereto.

72. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

73. As a result of the facts set forth herein, Plaintiff has not made any demand on the LifeMD Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

74. At the time of filing this action, the Board consists of Defendants Schreiber, Strawn, DiTrolio, Simon, LaRovere, Febbo, and MacRae (the "Director Defendants"). Plaintiff needs only to allege demand futility as to half of the seven directors who are on the Board at the time this action is commenced.

### DEMAND IS EXCUSED AS TO THE DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

75. The Director Defendants all face a substantial likelihood of liability for their actions in issuing the false and misleading 2025 Proxy, which resulted in their reappointment to the Board despite their breaches of fiduciary duty.

76. Demand is excused as to the entire Board, because the Director Defendants breached their fiduciary duties of loyalty by making false and misleading statements that inflated guidance for 2025 and failed to disclose rising customer acquisition costs for LifeMD's RexMD segment as well as its weight management program. The Director Defendants were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, prospects, internal controls, and financial statements were accurate. Accordingly, the entire Board faces a substantial likelihood of liability for making materially false and misleading statements.

77. Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused the public statements and publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

78. If the Director Defendants were to bring a suit on behalf of LifeMD to recover damages sustained as a result of the misconduct alleged herein, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

**DEFENDANT SCHREIBER LACKS INDEPENDENCE**

79. Defendant Schreiber is not disinterested for purposes of demand futility because he is the Co-founder of LifeMD and his principal occupation is Chairman and CEO of LifeMD. Accordingly, his livelihood is dependent on and completely intertwined with the other Director

Defendants.

80. Schreiber is additionally incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

81. Lastly, Schreiber is incapable of considering a demand because he personally benefited from the Individual Defendants' false and misleading statements by having the opportunity to sell shares of LifeMD stock at artificially inflated prices, a benefit not shared by the rest of LifeMD stockholders.

## DEFENDANT FEBBO LACKS INDEPENDENCE

82. Per the 2025 Proxy, LifeMD admits Febbo is not considered independent due to his below consulting agreement with the Company:

> On June 20, 2023, the Company and Mr. William Febbo entered into a director agreement, whereby, as compensation for his services as a member of the Board, Mr. Febbo received: (i) a grant of 75,000 restricted shares of common stock, with 37,500 restricted shares vesting immediately and 37,500 restricted shares vesting on June 20, 2025, and (ii) a stock option to purchase 37,500 shares of common stock, vesting on June 20, 2025.
>
> On May 30, 2023, the Company and Mr. Febbo entered into a consulting services agreement, pursuant to which Mr. Febbo agreed to provide certain investor relations and strategic business development services, in consideration for 375,000 restricted shares of common stock, which vested in quarterly installments from August 30, 2023 through November 30, 2024. The Company issued 250,000 restricted shares of common stock, with a fair value of $525 thousand, related to this agreement during the year ended December 31, 2024.

83. Accordingly, Defendant Febbo lacks independence because of his financial entwinement with the Company.

## DEMAND IS EXCUSED AS TO DEFENDANTS SIMON, STRAWN, AND LAROVERE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

84. Defendants Simon, Strawn, and LaRovere, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the public statements and

presentations, and the filing of financial statements, and allowed the Company to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants Simon, Strawn, and LaRovere were obligated to review the Company's financial reporting to ensure its accuracy and to ensure that the Company's internal controls were performing adequately. Instead, Defendants Simon, Strawn, and LaRovere, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, and the Company's systems of internal controls, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Simon, Strawn, and LaRovere.

## COUNT I
### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

85. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LifeMD's business and affairs.

87. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

88. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LifeMD.

89. In breach of their fiduciary duties owed to LifeMD, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading

statements and/or omissions of material fact that: (1) LifeMD's competitive position was overstated; (2) LifeMD's 2025 guidance failed to properly account for rising customer acquisition costs in its RexMD segment as well as its weight management business; and (3) as a result, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

90. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, LifeMD has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91. Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## COUNT II
### AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

92. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]." 15 U.S.C. § 78n(a)(1).

94. Rule 14a-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

95. Under the direction and watch of the Director Defendants, the 2025 Proxy failed to disclose that contrary to the 2025 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

96. The 2025 Proxy was also false and misleading because it failed to disclose that: (1) LifeMD's competitive position was overstated; (2) LifeMD's 2025 guidance failed to properly account for rising customer acquisition costs in its RexMD segment as well as its weight management business; and (3) as a result, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

97. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy, including but not limited to, the reelection of the Director Defendants and the reappointment of CBIZ as the Company's auditor.

98. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy.

99. Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## COUNT III
### AGAINST THE INSIDER SELLING DEFENDANTS FOR MISAPPROPRIATION OF INFORMATION

100. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101. At the time of the stock sales set forth herein, the Insider Selling Defendants knew of the information described above and sold LifeMD common stock on the basis of such information.

102. The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold LifeMD common stock.

103. The Insider Selling Defendants' sale of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

104. Since the use of the Company's proprietary information for their own gain constitutes a breach of Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV
### AGAINST THE INSIDER SELLING DEFENDANTS FOR UNJUST ENRICHMENT

105. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106. The Insider Selling Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of LifeMD common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

107. To remedy the Insider Selling Defendants' unjust enrichment, the Court should order these defendants to disgorge to the Company all proceeds derived from their wrongful conduct and/or their illegal sales of LifeMD common stock.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of LifeMD and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

C. Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of LifeMD stock while in possession of insider information, and imposing a constructive trust thereon;

D. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 7, 2025

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Brandon Walker*
Brandon Walker
Melissa A. Fortunato
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: walker@bespc.com
fortunato @bespc.com

Ligaya T. Hernandez
**BRAGAR EAGEL & SQUIRE, P.C**.
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (646) 860-9155
Facsimile: (212) 214-0506
Email: hernandez@bespc.com

# VERIFICATION

I, Tracey Ellis III, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of LifeMD, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of LifeMD,Inc. stock and have continuously held LifeMD, Inc. stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of November 2025.

Tracey E (Nov 5, 2025 15:20:49 CST)

Tracey Ellis III